UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 7 |
| Kissie Gartei, | . |  |
| Debtor. | . | Bankruptcy #22-11355 (ELF) |

..............................................................

Philadelphia, PA
August 10, 2022
1:05 p.m.

TRANSCRIPT OF ZOOM HEARING TO CONSIDER THE VALIDITY AND
ENFORCEABILITY OF THE TWO (2) SEPARATE RETENTION/COMPENSATION
AGREEMENTS BETWEEN THE DEBTOR AND DEBTOR'S COUNSEL

BEFORE THE HONORABLE ERIC L. FRANK
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For The Debtor: | Michael A. Cibik, Esq.<br>Cibik Law, PC<br>1500 Walnut St-Ste. 900<br>Philadelphia, PA 19102 |
| | Michael Assad, Esq.<br>Cibik Law, PC<br>1500 Walnut St-Ste. 900<br>Philadelphia, PA 19102 |
| For The U.S. Trustee's<br>Office: | John Schanne, Esq.<br>Office of the U.S. Trustee<br>900 Market St.-Ste. 320<br>Philadelphia, PA 19107 |
| Audio Operator: | Chris Caruso |

2

Transcribing Firm:              Writer's Cramp, Inc.
                                1027 Betty Lane
                                Ewing, NJ 08628
                                609-588-8043


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1          THE COURT:  Good afternoon.  For the record, this is

2     Judge Frank.  This is a hearing in the case of <u>Kissie Gartei</u>,

3     I hope I'm pronouncing that right.

4          MS. GARTEI:  Yes.

5          THE COURT:  Scheduled today is a hearing concerning

6     the debtor's fee arrangement with counsel.  Let me begin by

7     taking appearances first.  We can start with debtor's counsel.

8          MR. ASSAD:  Michael Assad representing the debtor.

9          MR. CIBIK:  Michael Cibik representing the debtor.

10          THE COURT:  Mr. Schanne?

11          MR. SCHANNE:  Good afternoon, Your Honor.  John

12     Schanne on behalf of the United States Trustee.

13          THE COURT:  And I see that the debtor is here, Ms.

14     Gartei.

15          MS. GARTEI: Yes, I'm here.

16          THE COURT:  All right, let me sort of set the stage

17     for this.  I entered an order scheduling a hearing.  The order

18     referenced the subject matter of the hearing as being the

19     validity and enforceability of the two separate retention and

20     compensation agreements.  I think subsumed within that concept

21     is also a more traditional §329 issue, which is simply the

22     reasonableness of the fees as well.  I think that's all

23     covered by my order.  And I thought that the best way to start

24     would be just to get a few facts on the record that are, I'm

25     sure, undisputed, and if I could ask a few questions of

4

1  debtor's counsel, I think that would expedite things.  I don't

2  know who's going to take the lead here, is it Mr. Cibik or Mr.

3  Assad?

4          MR. CIBIK:  Mr. Assad will do that.

5          THE COURT:  All right.  I'm working from the 2016(b)

6  disclosure as a starting point.  It says the debtors have

7  agreed to pay 2,553.  Now am I correct that some portion of

8  that represents expenses, not attorney compensation?

9          MR. ASSAD:  That's correct.

10          THE COURT:  Okay.  Can you quantify those amounts

11  for me?

12          MR. ASSAD:  Yes.  The filing fee -- I will -- just -

13  - allow me just a moment here to gather that.

14          MR. CIBIK:  Was 338.

15          MR. ASSAD:  So the filing fee of $338 for the court

16  is one component of the fee that's included.  The other would

17  be $37 for a credit report.

18          THE COURT:  Okay, now --

19          MR. ASSAD:  And that would --

20          THE COURT:  Go ahead, I'm sorry.  Please continue.

21          MR. ASSAD:  The $20 for the credit counseling.

22          THE COURT:  All right, so --

23          MR. CIBIK:  And also money for the debt management

24  course.  I forget what that fee is, another 20 or something

25  like that.

5

1          MR. ASSAD:  That comes late -- that's not charged to

2    us until later, though, because that comes when they do it.

3          THE COURT:  All right, so we're excluding that for

4    now.  So I'm getting a total of $395.  My math right?

5          MR. CIBIK:  And actually, that debt management

6    course, we get billed for that.  We pay that up front.

7          THE COURT:  So Mr. Cibik thinks I need to add

8    another -- was it 20?  Is that what you said?

9          MR. ASSAD:  20, so --

10          THE COURT:  All right.

11          MR. CIBIK:  Yeah, I would say, yes, somewhere in

12    that ball-parking.

13          THE COURT:  All right.

14          MR. ASSAD:  So that brings it to 415 by my

15    calculation.

16          THE COURT:  Okay.  Now how much of that 415 do you

17    consider to have been expended at the time of the filing of

18    the case?  In other words, you start off by saying prior to

19    the filing I have received 549.  So how much compensation did

20    your office receive prior to the filing?  If we carve out the

21    pre-filing expenses.

22          MR. ASSAD:  I would take that to be $134, if we're

23    taking the 549 and the --

24          THE COURT:  Well, I'm not saying -- you're answering

25    in the conditional.  I'm actually what actually happened.  I

1   mean, how much was expended by the firm before the case was

2   filed?

3            MR. ASSAD:  415.

4            THE COURT:  Okay.  Now it would have been that the

5   total expected legal fee is 2,553 minus 415, which is 2,138?

6            MR. ASSAD:  I'm sorry, say -- would you repeat that,

7   please?

8            THE COURT:  Well, based on the 2016(b) disclosure,

9   debtor has agreed to pay 2,553, but we've identified 415 of

10  that as representing expenses.  So that would mean the

11  compensation component is $2,138, putting aside how much you

12  got up front, right?

13           MR. ASSAD:  Right.

14           THE COURT:  Okay.  And so if we then subtract out

15  the 134 which you say represents the compensation portion of

16  the $549, do you see it -- the balance due would be $2,004,

17  right?

18           MR. ASSAD:  Right.

19           MR. CIBIK:  That's in the ballpark, yes.

20           THE COURT:  Now that seems to be consistent with

21  your exhibit-A, the pre-filing agreement.  If you look at page

22  -- where?  I just saw it.  Let me find it again.

23           MR. ASSAD:  Is it page 4, Your Honor?

24           THE COURT:  Page 4?  Okay.  Yes, it's in the last

25  paragraph on that page.  Okay.  All right, I think those are

1    the basic facts of the case, correct?

2             MR. ASSAD:  Yes, Your Honor.

3             THE COURT:  And I guess a couple other facts would

4    be assuming that the arrangement set out in the pre-petition

5    as well as the post-petition agreement are carried out, what

6    is the amount that the debtor became obligated to pay under

7    the post-petition agreement?

8             MR. ASSAD:  Under the post-petition agreement, the

9    debtor became obligated to pay $2,004.

10            THE COURT:  And that is in monthly installments?

11            MR. ASSAD:  Yes, that's in -- yes, in monthly

12   installments of $167.  For 12 --

13            THE COURT:  Which takes how many months?

14            MR. ASSAD:  For 12 months.

15            THE COURT:  Under the agreement, when was the first

16   installment due?

17            MR. ASSAD:  The first installment was due -- I'm

18   sure I'd been -- I know the new agreements that we use say

19   it's due within -- it's due 30 days after filing a post-

20   petition agreement.

21            THE COURT:  I think that's in here, too, somewhere.

22            MR. ASSAD:  But I -- I believe so, too, but I -- so

23   the pre-petition agreements outlining the potential post-

24   petition agreement explains that the first payment in a post-

25   petition agreement would be due no later than 30 days after

1    signing a post-petition if the debtor does so.  But --

2              THE COURT:  Okay, that's on page 5, correct?

3              MR. ASSAD:  Correct.

4              THE COURT:  Okay.

5              MR. ASSAD:  But it doesn't appear to me that the

6    post-filing agreement says that.

7              THE COURT:  Okay.  Now in fact, what has occurred in

8    this case in the way of additional payments?

9              MR. ASSAD:  The debtor began making payments 30 days

10   after the post-petition agreement was filed.

11             THE COURT:  You mean after it was signed?

12             MR. ASSAD:  After it was signed, I'm sorry, yes.

13             THE COURT:  And when was it signed in this case?

14             MR. ASSAD:  It was signed on June 8th.

15             THE COURT:  So the first payment would have fallen

16   due roughly July 7th.  How many payments have you -- you

17   received only one payment so far?  It's just the August

18   payment is due, or August has been paid?

19             MR. ASSAD:  Mr. Cibik, have we received a second

20   payment yet?

21             MR. CIBIK:  I'm going to check that out, look at

22   that right now.

23             THE COURT:  Can you tell me what the relationship is

24   between your use of exhibits A and B compared to C and D,

25   which seem to cover a lot of the same subject matter?

1          MR. ASSAD:  C and D we began using not in this case

2     but after the UST's memorandum came out and D and E are --

3     make some revisions to --

4          THE COURT:  Okay.

5          MR. ASSAD:  -- conform to those standards.  So I

6     know, you know, one of them is if a UST memo says you have to

7     make very clear as to your obligations of having to continue

8     as counsel, potentially, if the agreement is not entered into.

9     It also requires the legal fees and services be the same, say

10    you pay it all now or you pay it installments, you have to

11    offer the same fee, you can't say, well, it's less if you pay

12    now and more if you pay later.  So it takes into account all

13    of the -- all of those changes and makes it in line with that.

14         MR. CIBIK:  But Your Honor, going back to your

15    question on the payments, our records reflect that we had, I

16    believe, two payments from Mrs. Gartei.

17         THE COURT:  Received two post-petition?

18         MR. CIBIK:  Yeah, yeah.

19         THE COURT:  Okay.

20         MR. CIBIK:  Yeah, it's either two or three.  I see

21    one payment failed here, but I'm thinking that that was

22    offset.  I think it's two; at most it would have been three.

23         THE COURT:  Okay.  I'm glad you explained the

24    difference between the sets of agreements.  They're very

25    detailed documents, and once I got through A and B, I wasn't

1   really sure there was a way for me to read C and D to look for

2   what the differences would be, since the similarities are --

3   certainly outweigh the differences.  But you're saying the two

4   differences are that -- well, actually, I'd like to see the

5   language in -- whether it's in C or D, regarding the enhanced

6   description of your potential duty to continue representing if

7   the court doesn't allow for withdrawal.  Bear with me a

8   moment; I need to pull that one up.  I'll tell you when I have

9   it, and then --

10          MR. ASSAD:  Well, on exhibit-A, if we're counting

11  the cover page, it's one, two, three -- it's paragraph D on

12  the sixth page.

13          THE COURT:  On exhibit -- which exhibit now?

14          MR. ASSAD:  That's exhibit-A.

15          THE COURT:  On the sixth page, exhibit --

16          MR. ASSAD:  Paragraph D.

17          THE COURT:  Paragraph D of --

18          MR. ASSAD:  That's if we're counting the cover

19  pages.

20          THE COURT:  4D, not 5D.  Okay.

21          MR. ASSAD:  Yeah.

22          THE COURT:  Okay.  And exhibit-C changes that in

23  some way?  I'm sorry, exhibit --

24          MR. ASSAD:  Yes.  Exhibit-D --

25          THE COURT:  -- D changes that in some way.

1          MR. ASSAD:  Yes, on the -- we're counting the cover

2     pages, one, two -- it's the third page and the one, two -- the

3     fourth or fifth paragraph, depending on what you consider a

4     paragraph to be.

5          THE COURT:  It's the second sentence and which

6     starts, "We will ask the bankruptcy court to allow us to

7     withdraw..." is that the one?

8          MR. ASSAD:  It -- yes.

9          THE COURT:  Okay.  Is your firm now essentially

10    offering these different payment options to every potential

11    chapter 7 debtor who is possibly contemplating filing through

12    your office?

13         MR. CIBIK:  Well, it all depends, Your Honor.

14    Obviously we'd be more amenable to being paid up front, but,

15    you know, it's not real world.  I know Mr. -- in Mrs. Gartei's

16    situation, she was looking at staring at a garnishment.  She

17    flat out missed a court case where she was being sued by a

18    creditor, I forget which one, 12 or 13 hundred dollars.  They

19    got a judgment in the early part of May.

20         THE COURT:  Well, let's hold off about just our

21    case, particular circumstances for a moment.  I'm listing

22    generally.  So you're --

23         MR. CIBIK:  The answer is no to your--

24         THE COURT:  -- would it be fair to  say that --

25         MR. CIBIK:  No.

12

1            THE COURT:  You would start off hoping to enter an
2      arrangement where the debtor pays the entire fee to begin
3      with.
4            MR. CIBIK:  Oh, yeah, if that's possible.  In fact,
5      they just look at me and say that's not possible and I say,
6      look, let me work with you.  That's pretty much --
7            THE COURT:  Now, would you use a separate -- and you
8      had a separate retainer agreement for that case?
9            MR. CIBIK:  No.
10           THE COURT:  The case where the person says I can't
11     come up with the money?
12           MR. CIBIK:  I tell them up front what I'm going to
13     charge them.  I never even discuss that with them.  Don't even
14     bring that to the table.  I just say here's my fee --
15     typically it's 1,500.  If it's a little complex, 17, 2,000.
16     Somewhere between 1,500 and 2,000.
17           THE COURT:  Okay.
18           MR. CIBIK:  So like I say, it's just two components
19     here.  There's the costs, which are X, and here's my fee.  And
20     they look at me many times, I just can't afford that.  I say
21     maybe I can work with you, and that solves it.  We work it
22     out.  Pretty much once I pretty much agree to post-petition,
23     they could work and we could file for them and, you know, save
24     them from a -- whatever, foreclosure, garnishment, car repo,
25     whatever.

1            THE COURT:  Okay.  But based on what I heard

2    earlier, is it accurate then that under the new agreements

3    that you're using, after reviewing the U.S. Trustee policy

4    statement, that the standard fees you're charging would be the

5    same fees that you would charge if the debtor was paying all

6    of the fees to begin with?  It's back down to the 1,500 to

7    1,700 that is the typical range?  Obviously not every case,

8    but the most common range, is that a fair statement?

9            MR. CIBIK:  You would find it unusual for us to be

10   charging more than two grand.  That would have to be some

11   complex fees in there.  So I'm in the 15 to 2,000 range.

12           THE COURT:  And that's now true even if you want to

13   enter into a deferred payment agreement, or bifurcated set of

14   agreements with the debtor, is that right?

15           MR. CIBIK:  I'm the one that sees the debtor, and to

16   my knowledge I don't think I've ever said, hey, I'll cut you a

17   deal here or something like that.  I don't do that.

18           THE COURT:  I'm not sure we're talking about the

19   same thing.  Maybe we are.  This arrangement with Ms. Gartei

20   has an enhanced fee because it's a bifurcated arrangement.

21   Did I hear correctly earlier that you've changed your policy

22   on that, your fees were always going to be equivalent to what

23   -- in a bifurcated arrangement as to what they would be in a

24   pay-everything-up-front arrangement?  Is that a correct

25   statement?

1          MR. CIBIK:  Run that past me again.

2          THE COURT:  I think that --

3          MR. CIBIK:  It's pretty much the same.

4          THE COURT:  -- in light of the new agreements that

5     you're using --

6          MR. CIBIK:  Uhm-hum.

7          THE COURT:  -- are you charging any more if the

8     debtor enters into a bifurcated fee arrangement than if they

9     can pay everything up front?

10         MR. CIBIK:  I am not.

11         THE COURT:  Okay.  All right, let me ask a bit about

12    Ms. Gartei's -- or actually, let me ask a different question

13    next, though, before I get to Ms. Gartei.  Would it be fair to

14    say you encounter situations where the debtor would like a

15    bankruptcy, from your preliminary interview it does appear

16    that it may well be appropriate to file, the debtor does not

17    have the ability to file promptly or immediately because the

18    debtor doesn't have all the money, but instead of entering

19    into a bifurcated fee arrangement, you simply have the debtor

20    wait until the debtor can raise the money that satisfies your

21    fees?  Is that a path that your office is taking with your

22    prospective clients as well?

23         MR. CIBIK:  That is true, that is true.  Most of the

24    times I would say to them, how long is it going to take;

25    typically they'd say a month or two.  And what I actually tell

15

1    them is I'll say, look, what I can do is if you want to give

2    us some kind of a payment down and make a payment plan, I will

3    run interference for you for two months -- probably the most

4    is two months -- so when a creditor calls you and they say,

5    look, what are we doing about paying this bill, you can refer

6    them to me, and when they come to me I say, look, we're going

7    to be filing a chapter 7.  We need more documentation.  Then I

8    estimate it might be another month or so and let the chips

9    fall as they may.

10            THE COURT:  Okay, I understand that.

11            MR. CIBIK:  My clients generally say, you know what,

12    I really don't want to wait, but that's their choice.

13            THE COURT:  Okay.  So from your perspective, the

14    perspective of the law firm here, what were the circumstances

15    that made it appropriate for Ms. Gartei to enter into a

16    bifurcated agreement as opposed to waiting, if she was unable

17    to raise all the fees initially?

18            MR. CIBIK:  I think you might want to ask her that,

19    but --

20            THE COURT:  Well, I could.  I want to understand

21    from your perspective why the firm thought it was appropriate,

22    and then I'll ask her as well.  I don't know if it's you or

23    Mr. Assad who has more insight into that.  Either one of you

24    can tell me.

25            MR. ASSAD:  Mr. Cibik had interviewed her and done -

1    - did the intake, but my understanding from the intake memo

2    and everything is that at the time she was fending off a

3    lawsuit and there was a potential garnishment that would take

4    effect soon on her bank account.  Mr. Cibik, is that correct?

5           MR. CIBIK:  Yes, that is correct.  Yeah, I just

6    looked up the record.  On May 2nd she got the judgment, and we

7    filed on the 25th, which is about three weeks later.

8           THE COURT:  Okay, bear with me a moment.  Okay, let

9    me ask Ms. Gartei a couple questions.

10   BY THE COURT:

11   Q.  When you sought assistance for your bankruptcy filing from

12   Mr. Cibik's office, did you feel you were in an emergency

13   situation?

14   A.  Yes, I did.

15   Q.  Tell me why.  From where you were sitting, why was it an

16   emergency?

17   A.  Prior to me seeking help from this law firm, I had been

18   going through a long, long amount of time of financial

19   hardship, and there was a moment in time I tried to repair my

20   credit and I came across a debt consolidation company, and I

21   went and I trusted them to help me fix my credit.  There was a

22   point in time I tried to cancel, but they were charging me an

23   enormous amount of fee that I couldn't afford at the moment,

24   so I just struck an agreement with them trusting that they

25   would help me out.  Years -- a year later, come to find out

1    they -- it was all a scam, that my money was -- I don't know

2    where my money was gone, and one of the potential -- one of

3    the creditors that they should have been helping me out with

4    ended up filing a judgment against me, and --

5    Q.  Can you tell me the name of that creditor?

6    A.  It was LVN Funding.  It was a collection agency, actually.

7    And they filed a judgment against me.  At that moment when I

8    received the judgment, I was even -- I was in a -- I was still

9    in a financial hardship.  I had just gone for CAR-X and I was

10   out of work.  There was a lot going on with my finances at

11   that moment and just a lot going on with me mentally and

12   things like that.  So, you know, based off of all the, like,

13   the letters I was receiving in the mail and trying to

14   communicate with this credit card consolidation company that I

15   was re-evaluating my financial situation, everything, I just

16   felt like my back was up against the wall and I -- you know, I

17   was like -- I've been fighting to get a financial clean slate

18   here, and everything that I seem to be doing doesn't seem to

19   be working out and it's just causing me a deeper financial pit

20   here, and things like that.  So at that moment, honestly, I

21   felt like my back was against the wall and that's the route

22   that I went.

23           THE COURT:  From what you're describing, it's

24   sounding to me -- and you should tell me if I'm understanding

25   it correctly -- that the judgment that was entered against you

18

1  was like the straw that broke the camel's back, that was --

2  that finally made you feel you needed to do something to

3  protect yourself, is that what you're saying?

4  A.  Yes, because at that moment what went through my mind,

5  there was no way I was going to be able to afford that, and

6  all the other creditors now that I'm going to have to deal

7  with that this company was so-called supposed to be helping me

8  out with, like, you know, settling out my -- all of my

9  financial debts and things like that.  It was just like -- it

10 was no way.  And on top of my financial responsibilities that

11 I already had in place, you know, me and my son and things

12 like that, like it was just a lot.

13 Q.  Okay.

14 A.  And I felt like, honestly, there was like no light at the

15 end of the tunnel.  Like I'm like I'm trying to get things in

16 order and get myself right and, you know, so I can create a

17 better life for my son and I, and it was -- like I said, my

18 back was up against the wall.

19 Q.  Just for the sake of the record, I'll point out that the -

20 - Ms. Gartei's statement of financial affairs identifies a

21 lawsuit, it seems to have been filed in March of 2022 in

22 Philadelphia Municipal Court, LVNV Funding, in the bankruptcy.

23 A.  I didn't find out about it until April.

24 Q.  Right.

25 A.  When I found out about it, it was like after -- at the

19

1    stage where they're going to start collecting and I'm like I

2    don't have nothing to collect.

3    Q.  Now I heard some reference earlier from Mr. Cibik or Mr.

4    Assad that there was some concern about your bank accounts.

5    Were you worried about your bank accounts?

6    A.  The fact that once I was to return back to work that they

7    were going to start return -- like, you know, pulling money

8    from me and things like that, and it's just like they have

9    money that I won't be receiving, I need it to satisfy my

10   response -- my financial responsibilities.  That was -- the

11   money that they was asking for was not money that I was able

12   to take, like, you know, that I had to give out.  There was,

13   you know, other things that I felt -- my living, my son and I

14   living was at stake here.  It was like ranked, everything.

15   How am I going to get to work if I don't pay this and that,

16   you know?

17   Q.  Now I take it that when you consulted with Mr. Cibik and

18   the bankruptcy process was explained to you and his legal fees

19   were explained, that you did not have money available to pay

20   the entire fee and the filing fees and other associated

21   expenses up front, is that --

22   A.  No, at that moment, no, I did not have money to pay up

23   front.

24   Q.  Okay.

25         THE COURT:  Just to digress for a second, I noticed

1    that LVNV is in the statement of financial affairs and is the

2    plaintiff who obtained a judgment against Ms. Gartei.  I don't

3    see him in schedule EF.

4    A.  Pardon me?  Say that last part again.

5    Q.  I said -- I'm actually directing that question to Mr.

6    Assad.

7    A.  Okay.

8         MR. CIBIK:  I'm sorry, what was the question again,

9    Your Honor?

10        THE COURT:  LVNV is described as being the plaintiff

11   in the municipal court action that seems to have triggered

12   this bankruptcy case.  I don't see LVNV in the schedules.

13        MR. ASSAD:  Sorry, I was on mute there.  I am

14   checking that now because sometimes it's listed under the

15   underlying creditor.

16        THE COURT:  Well, why would it be?  If LVNV got the

17   judgment in its own name, isn't LVNV the creditor?  Why

18   wouldn't you list LVNV?

19        MR. ASSAD:  Yes, that would -- that was an error on

20   our part.

21        MR. CIBIK:  Yeah, well, you know, I don't see it

22   there either.

23        THE COURT:  Fortunately it's an error that didn't

24   cause problems.  Because if LVNV didn't get notice of the case

25   and then proceeded to execute on its judgment, you would have

1    had to undo all of that.

2           MR. ASSAD:  Right.

3           THE COURT:  But apparently that didn't happen, so --

4           MR. CIBIK:  Mike Ratchford was on here.  Michael

5    Ratchford was notified.  He's the attorney for LVNV.  We have

6    him on here as a noticed creditor, and if you look --

7           MR. ASSAD:  Okay.

8           MR. CIBIK:  -- we redirect that account number as

9    the --

10          THE COURT:  All right, but you realize that's not

11   adequate, just sending it to the creditor's lawyer.  The

12   creditor should get notice of the case, they're the party.

13          MR. CIBIK:  We normally do --

14          THE COURT:  As I said, that's an aside.  That's not

15   why we're here today.

16          MR. CIBIK:  No, no.

17          THE COURT:  I'm not too overly concerned about that.

18          MR. CIBIK:  Right.  I don't know how that happened,

19   but we did notify Ratchford, we called him right away when the

20   7 was filed.  That's always our practice.

21          THE COURT:  Okay.  I think those are all my

22   questions.  I think the way I'd like to proceed at this point

23   would be in two steps.  First, if there is anything else that

24   -- I mean -- oh, actually, I had one other question.  More

25   than one question.  Never believe a lawyer who says they only

1  have one question.  It's true about one that's out of a

2  hundred, even when it's the judge saying that.  In your

3  chapter 7 cases, regardless whether it's a case where the fee

4  is paid up front or it's a bifurcated fee, do you typically

5  keep time records?

6         MR. ASSAD:  Not typically.

7         THE COURT:  Okay.  So would it be fair for me to

8  infer then that the time records you submitted for the pre-

9  petition were -- here were reconstructed?

10        MR. ASSAD:  Yes.  Yes, I believe I put that in the

11  title at the top of each one that they are reconstructed

12  records.

13        THE COURT:  Okay.

14        MR. CIBIK:  But our system, just to elaborate a

15  little bit, is such that if there's a phone call it's

16  automatically logged into the system for these time matters.

17  If there is an email that is transferred into time matters, so

18  you can go back and easily reconstruct it rather than doing it

19  every day, which is not economical.  So we have the records

20  there of the touch or whatever you want to call it, the

21  interaction with the client or with a defendant, potential

22  defendant.  So we'd have all that, phone calls, emails,

23  they're all put on at the time so we can go back and easily

24  reconstruct it rather than do it on a daily basis or an hourly

25  basis.

1          THE COURT:  All right, now if we look at the time

2     records just for a moment, which is exhibit-C, you're using

3     just the summary.  Pre-petition, pre-filing time is described

4     as 3 hours of attorney time and 1.29 hours of paralegal time.

5     And the post-petition amounts are 4.87 attorney time and 2.33

6     attorney time, is that right?

7          MR. ASSAD:  That's correct.

8          THE COURT:  Okay.  All right, I want to go into the

9     pre-filing agreement with you for a moment and ask you about a

10    couple things.  I just realized I had a bunch more questions.

11    And to the extent that I touch on something that you've

12    changed, please tell me.  I'm on page two and I'm looking at

13    your description of the pre-filing and the post-filing

14    services.

15         MR. ASSAD:  Yes.

16         THE COURT:  Second line in the post-filing services

17    is preparing and filing a means test calculations and

18    disclosures.  Does that mean that you don't conduct a means

19    test calculation before you file a chapter 7 case for a

20    debtor?

21         MR. ASSAD:  Which -- I'm sorry, is -- so it's -- is

22    that under option 2, is that where it says that?

23         THE COURT:  Work involved in a chapter 7 case.

24         MR. ASSAD:  Oh.

25         THE COURT:  Page 2.  Pre-filing services and then

1    post-filing services.

2          MR. ASSAD:  Oh, I see.  Okay.

3          THE COURT:  So I guess my question is you don't feel

4    it's necessary to do the means test calculation before you

5    file a chapter 7 case for a debtor?

6          MR. ASSAD:  So generally, in many of these pre-

7    filing agreement cases we -- the debtors usually have such

8    little income or it's such the income that their below-median

9    status is apparent from just looking at their -- the paystubs

10   without tabulating and putting it through the calculator and

11   preparing the actual form itself.

12          THE COURT:  Okay.

13          MR. CIBIK:  I might add something to that.  As I

14   recall, generally I will ask the client individually what

15   they're making, ask them if they're married, separated,

16   single, divorced, widowed, whatever have you, and then I ask

17   them if they have dependents.  And in Ms. Gartei's case, she

18   had one dependent, so the means test went from 58 to 72

19   thousand.  I believe she -- I usually try to have clients

20   bring in their paystub, at least their paystub so I get some

21   idea, and I just quickly look at that and say it looks like

22   you're underneath the $72,000 threshold, so we're not going to

23   have a problem with that issue on the chapter 7 so we'd have

24   to put you in the chapter 13 potentially.  So that's something

25   I can pretty much do in probably about 15 minutes.

1          THE COURT:  Now let me follow up on that, Mr. Cibik,

2    because the line above the one I was just reading talks about

3    preparing the statement of financial affairs being a post-

4    filing service.  Now it would seem to me one of the most

5    significant pieces of information in the statement of

6    financial affairs from the counseling point of -- perspective

7    of a prospective chapter 7 debtor is knowing whether or not

8    there are potential voidable transfers, because if there are,

9    you're going to be putting the trustee on notice of them in

10   the statement of financial affairs.  To what extent do you

11   cover that if you haven't completed the statement of financial

12   affairs, or in other words have you gone over that kind of

13   information with the debtor if you haven't completed the

14   statement of financial affairs before you file?

15         MR. CIBIK:  Well, you go through the questions on

16   the statement of financial affairs with the debtor and most of

17   the times it's no, no, no, and you take their word for it,.

18   You discover something later on when you go in more depth.

19   The problem that you're also confronted with is if you had to

20   do all this up front you probably wouldn't take the case

21   because you're saying you can't pay me up front, I've got to

22   wait while the --

23         THE COURT:  Well, but doesn't that mean that some of

24   the preparation, the statement of financial affairs and

25   schedules, takes place before the filing, it's not really a

1   post-filing service entirely?

2        MR. CIBIK:  Well, you get a snapshot.  Sometimes

3   clients don't bring in their paystubs 'til after the filing,

4   so I asked them, what do you think you make, and if we have an

5   emergency, we've got to go on their reliance.

6        THE COURT:  Okay.

7        MR. ASSAD:  If I may just note that the petitioner -

8   - the agreement says preparing and filing your statement of

9   financial affairs and schedules, which really I take that to

10  mean the actual putting together of the document, filling it

11  out based on notes and things like that and filing it with the

12  court.  I think that what the court is saying about getting

13  information that may be listed on this statement of financial

14  affairs falls under, you know, pre-filing services says, you

15  know, meeting and consulting with you as needed prior to

16  filing your case, analyzing the information from your intake

17  questionnaire and other documents, preparing -- providing due

18  diligence in order to help you make important legal choices.

19  So although the pre-filing services aren't -- it doesn't say

20  explicitly that you're going to ask questions for the purpose

21  of filling out the statement of financial affairs, some of the

22  questions and the actions you're taking during that time fall

23  under what's described in pre-filing services.

24       THE COURT:  Go to page 3 in the same document, and

25  you have the box at the bottom of the page that says option 1.

1    That's now all changed, or it's changed in that the tag line -

2    - the pay before you file option is less expensive to you,

3    that's no longer --

4            MR. ASSAD:  That's correct.

5            THE COURT:  -- being stated in your information.

6    Okay.

7            MR. ASSAD:  That's correct.

8            THE COURT:  On page 7, again I'll call it the old

9    pre-filing agreement, at paragraph G, arbitration, do you

10   think that overrides §329 of the bankruptcy code?  Isn't it

11   really for the bankruptcy judge to decide the appropriate

12   amount of a chapter 7 fee, not an arbitrator?  Can you

13   arbitrate that out of the code?

14           MR. ASSAD:  No, I think the bankruptcy code always

15   supersedes any agreement between the parties.

16           THE COURT:  Is this in your latest form of agreement

17           MR. ASSAD:  It is.

18           THE COURT:  Well, you may want to think about that.

19           MR. ASSAD:  Yes, that's something we would -- that's

20   something that we would delete, because it's not something

21   that we typically -- it's not something that's included in our

22   typical fee agreement itself.  The --

23           THE COURT:  Oh, let me follow up on that.  So if

24   you, in your alternative agreement where the debtor pays the

25   entire fee up front, it conceivably could be a disagreement

1    later about the fee.  Somebody could have remorse saying I

2    paid you too much.

3           MR. ASSAD:  Sure.

4           THE COURT:  And those agreements you're saying you

5    do not have an arbitration clause.

6           MR. ASSAD:  It's silent as to any dispute.

7           THE COURT:  Okay.

8           MR. ASSAD:  This, just to give the court some

9    background, this is more or less a template that we have that

10   we got this fee agreement from, and sort of tailored it, so

11   it's -- that's the source of it.  So it's different, as I

12   said, from our typical agreement, so I wish that I had -- was

13   able to take the time to write all of this.  Like as you said,

14   it's very detailed.

15          THE COURT:  No, it's -- it is very detailed.  How

16   long have you been offering the bifurcated fee agreement as a

17   chapter 7 payment option?

18          MR. ASSAD:  Since last September or October.

19          THE COURT:  And how many of those would you estimate

20   you've filed?

21          MR. ASSAD:  Mr. Cibik, how many would you estimate?

22   I would offhand guess that it's about 20, but we'll -- what do

23   you --

24          MR. CIBIK:  In the ballpark.  Now, let me see, I'd

25   say in the 20 range.  I'd say half of the clients can't --

1    don't have the money, the other half may have the money and we

2    don't have to do the bifurcation.  But, you know, when it's an

3    emergency or they don't have the money, getting paid up front

4    isn't going to happen in a short notice.  Occasionally --

5              THE COURT:  Have you --

6              MR. CIBIK:  -- but that's --

7              THE COURT:  Have you had occasion to employ state

8    court collection procedures against any of the debtors?

9              MR. CIBIK:  Your Honor, I've been licensed for 45

10   years and I've never sued a client or clients.  I never intend

11   to do that.

12             MR. ASSAD:  And there has been -- I think it's only

13   one, but maybe two, but there has been -- there is one client

14   that, I guess, changed their bank account information.  We're

15   unable to collect on a monthly basis and we're unable to

16   contact them and we've effectively eaten it rather than

17   pursuing that.  It does remain an option, of course, but it's

18   not something we're interested in doing.  It's --

19             THE COURT:  But this doesn't -- my next question

20   doesn't really involve this case or your firm in particular.

21   Do you have a sense just from your participation in bar

22   activities or communications with other lawyers in the debtor

23   bar, the extent to which other law firms are also starting to

24   employ bifurcated agreements?

25             MR. CIBIK:  I saw in the beginning, I -- this was an

1    easy thing to trace you, just go into PACER and you can find

2    out the attorneys that are doing that.  What I've found is

3    that one or two of them went through a fresh start funding,

4    which was a factoring company.  I didn't like it at all

5    whatsoever and I felt we could do the same thing in house.

6    But there are other attorneys doing it.  I don't follow it as

7    much as I did in the beginning.

8         MR. ASSAD:  Okay.

9         MR. CIBIK:  I was more or less following nationwide

10   what was coming out of the bankruptcy courts.  I think the one

11   that was most prevalent to me when I decided to do this was

12   the case out of -- I think it was the southern district of

13   Florida, the judge down there, the chief judge Isicoff or

14   something like that, and she said yeah, you can do it, but

15   here's what you have to do, you've got to be explicit with the

16   pre- and the post-petition, and gave a road map on how to do

17   it.  And I thought that made sense and we tried to follow

18   that.

19        THE COURT:  Okay.  And I think that finally is my

20   last question.  So what I'd like to do next is take two -- go

21   in two steps.  One is to give Mr. Assad and Mr. Cibik, is

22   there anything else you want to add or describe about this

23   case in particular or your procedures and policies regarding

24   bifurcated fee agreements, and after you've done that I'll

25   turn to Mr. Schanne and find out if there's anything he wants

1   to ask or present.

2          MR. ASSAD:  So I --

3          THE COURT:  So we'll start with you, Mr. Assad.

4          MR. ASSAD:  I would only add that the -- and I think

5   we've covered it to some extent here, is that these are not --

6   these agreements are not really our preferred way of doing

7   business.  We prefer to get paid up front.  But it's

8   ultimately a way to help people get relief that wouldn't

9   otherwise be available to them.  So it sort of fills a gap in

10  between the people who are very indigent and need -- or are

11  eligible for something like, you know, Philadelphia Legal

12  Assistance, and people who may have means but don't have the

13  savings of the cash flow or what not to hire a lawyer and pay

14  substantial fees up front.  So really, it's a way to help

15  people that we would otherwise have to turn away, that's --

16  ultimately that's what I would add.  But I think that's

17  already been sort of said.

18          MR. CIBIK:  What I could add to dovetail with that

19  is the fact that it also would prevent attorneys from putting

20  their clients into small little chapter 13's where they're

21  committed for three years, so the bulk of that is to pay the

22  attorneys' fees.  I don't think that's the right way to

23  approach things.  I think this is a great compromise where

24  you're allowing them to pay it off.  And as I say to my

25  clients, tell me what you can do.  And if you're going to tell

1   me you're going to give me $10 a month for 40 years, I'm

2   saying I don't think I can go for that.  If you're telling me

3   you're going to be able to pay me in one month, I'll say boy,

4   that sounds great.  But so I really let the client in most

5   cases dictate the terms they want.

6         THE COURT:  Thank you.  Mr. Schanne, would you like

7   to participate in some fashion?

8         MR. SCHANNE:  Thank you, Your Honor.  As the court

9   noted, the UST does have the guideline memo of June 10th,

10  2022, and it sets forth the guidelines, which the UST review

11  as bifurcated agreements.  UST believes that bifurcated fee

12  agreements are permissible but that they require certain

13  things, such as the fees charged under the agreements are fair

14  and reasonable, that the agreements are entered into with the

15  debtor's fully informed consent, and that the agreements are

16  adequately disclosed.  Your Honor, I think you touched on one

17  of the things that really jumped out to us in review is that

18  the first area of focus in the memo in determining whether the

19  fees are fair and reasonable is ensuring that there's a proper

20  allocation between the pre-petition and the post-petition.

21  And you heard the testimony and you touched on the issues of

22  the intake is where most of the legal work is performed.

23  That's where you have to analyze the financials, that's where

24  you have to understand the case, that's where you have to

25  determine whether it's appropriate for a chapter 7 or a

1    chapter 13.  That is where the legal work occurs.  The rest of

2    it you heard the testimony, it's just kind of fill in the

3    boxes and check in what was already done up front.  A

4    bifurcated fee agreement is not an excuse to transform pre-

5    petition services and claims into post-petition fees.  That

6    work is required to be performed up front.  You heard that

7    work is performed up front.  The time records show that it's

8    about 40 plus percent of the time spent was spent before the

9    case was filed.  But when you looked at the allocation, you

10   have $134 for pre-petition legal fees.  You have $2,004 for

11   post.  It's unreasonable to use this agreement to simply

12   transform a pre-petition claim for pre-petition services into

13   a post-petition claim.

14        Your Honor, there are a variety of other issues, too,

15   that we have.  It's an interesting procedural posture because

16   we didn't object.  We're here on the court's order.  I don't

17   know how far you want to push into the other issues.  As you

18   heard, this is a form.  It's something we've started to look

19   at.  It's certainly something that we were going to raise an

20   issue at some point in some case.  I can preview those issues,

21   we can go through them.

22        THE COURT:  Sure, I'd like to hear it.  I would like

23   to hear at least a preview, even if they're not being raised

24   in this case.

25        MR. SCHANNE:  Sure.  Let's see if I can pull up my

1   notes here.  So we talked about the allocation and that it's

2   pulling the pre-petition into the post-petition.  You also

3   need to look at whether the fees are reasonable at all.  It

4   sounds like that issue has been fixed, but the firm charges a

5   premium, at least under the agreement in this case, which is

6   what we were here for, for the bifurcation.  The only extra

7   services that would be provided were the supplemental post-

8   filing services.  Those are services that may not arise in any

9   particular case.  So the debtor is being charged a premium for

10  services that may not even occur.  It's not reasonable to

11  charge for services that may not happen and therefore justify

12  a larger fee.  It sounds like that may be cleaned up in the

13  new agreements, but to the extent it's not and it's something

14  we've seen in other ones, it's a concern they charge a premium

15  for services that 1) we think you can't opt out of on a full-

16  pay case, and 2) you might not even perform in any case.

17       Going through the agreements themselves we have some

18  issues with the disclosures set forth therein.  Let me pull up

19  exhibit-A.  So we talk about the $338 filing fee, but when you

20  look at option 2, it says the $549 must be paid in full and

21  that includes the filing fee.  Then you read the post-

22  petition, it's 2,004, which includes the filing fee, unless

23  you've paid the filing fee.

24            THE COURT:  I thought that was unclear also.

25            MR. SCHANNE:  I don't understand how it can -- yeah,

1    I don't understand how a consumer can actually understand what

2    it is they're signing there, because I read it and couldn't

3    figure it out until we heard the testimony.

4        Ability to make payments, I'm in paragraph 3B.  That the

5    statements and schedule may show that the debtor can't

6    actually make the post-petition payments, and the debtors say

7    notwithstanding that, it's the best course for me.  I don't

8    understand what's the basis and the reasonableness to actually

9    come to that conclusion, because on the face of it, you can't

10    get there.

11        We go to paragraph 4C and we have a debtor signing that

12    they acknowledge, understand and provide informed consent to a

13    waiver of conflict.  My guess is that a debtor signing this

14    agreement would have a difficult time to get on the stand and

15    actually explain what that conflict is --

16        THE COURT:  You're breaking up a bit.  Maybe get a

17    little --

18        MR. SCHANNE:  -- and understanding the informed

19    consent that is being provided.

20        THE COURT:  Mr. Schanne, at least from -- on my end,

21    you're breaking up a little bit, so maybe you want to --

22        MS. GARTEI:  Same here.

23        THE COURT:  -- get a little closer to the

24    microphone.

25        MR. SCHANNE:  Okay, can you hear me now?

1              THE COURT:  Yeah, that's a little better.

2              MR. SCHANNE:  Okay.  When you look at paragraph

3    6A --

4              MS. GARTEI:  What page is that on?

5              MR. SCHANNE:  -- you have the debtor -- it is on

6    page 7 of 8.

7              MS. GARTEI:  Okay, thank you.

8              MR. SCHANNE:  You have the debtor representing that

9    they are entering into this pre-petition agreement with the

10   intent -- you heard the testimony was that this two-part

11   bifurcated agreement is not even offered until the client asks

12   for it, and then the clients represented that they fully

13   intend to sign the --

14             THE COURT:  All right, we've lost him.  I'm not

15   surprised, because he was breaking up.  Hopefully he'll come

16   back.

17             MR. CIBIK:  Your Honor, is it possible or is it

18   intended that the court may decide to set out some guidelines

19   on bifurcation for our court?

20             THE COURT:  At this point I don't know.  I mean,

21   this -- as far as I can tell, this is a first bifurcated case

22   that's triggered some scrutiny from any of the judges.  So

23   where it goes from here, I don't know.  This is new to us.  I

24   mean, it's -- obviously as you pointed out, there's been

25   national discussion about these arrangements.  It has now

1    migrated to the Eastern District of Pennsylvania, and --

2          MR. CIBIK:  Okay.

3       (Pause in proceedings)

4          MR. SCHANNE:  I'm sorry, Your Honor.  I've been on

5    Teams and that's been working, so it's not an internet, it's

6    something actually with Zoom.

7          THE COURT:  Okay, I'm going to need to take a short

8    recess.  So everybody just sit tight.

9       (Recess)

10          THE COURT:  Okay, when we lost you, Mr. Schanne, I

11   think you were talking about paragraph 6A of the agreement, I

12   think.  That's my last notes on it.

13          MR. SCHANNE:  Thank you, Your Honor.  John Schanne

14   for the record.  Paragraph 6A, you heard prior testimony that

15   this agreement is not offered until the client has already

16   asked for bifurcation.  And this agreement, which is the first

17   step, collapses the decision to design the second agreement

18   into one.  The choice of whether you will go through or not,

19   it's illusory, because you have right here the debtor

20   represented that the intention is to sign the second document,

21   and the debtor has already told counsel that.  So it collapses

22   them down.  6B is the issue we've already discussed about

23   further analysis and review.  You may decide the chapter 7 is

24   not right and maybe it's chapter 13 that needs to be done on

25   the front end.  Credit reports we heard on the testimony,

1   those were being pulled and ordered, but I didn't see were

2   there any disclosures as to the cost?  Turns out there is a

3   cost that's being sent to the debtor.  The arbitration of fee

4   disputes is an issue that you -- the court touched on already.

5   And those are -- oh, and then we also have 6C, and that talks

6   about that required disclosures will be made, included under

7   §527.  The court's order required that all such disclosures be

8   issued in response to the court's order.  No disclosures were

9   made, so I assume if they existed, they would have been

10  propounded in response to the court's order.  So the agreement

11  says they'll be provided; it seems like they were not.  And

12  because these are form agreements, the facts and circumstances

13  matter, but those are the issues that we've seen as we start

14  to review these things.

15          THE COURT:  Okay.  Let me stay with you for a few

16  minutes, a couple things I want to ask you about, Mr. Schanne,

17  and then I'll give Mr. Assad and Mr. Cibik a chance to add

18  whatever they wish to.

19          MR. SCHANNE:  Yes, Sir.

20          THE COURT:  Staying -- starting with just this

21  particular case, do you have a position on what the outcome

22  should be here, what I should do?

23          MR. SCHANNE:  We do think that the agreement falls

24  short of the standard that needs to be met under 329 for all

25  the issues, the reasons we just discussed.  And the primary,

1   the one that jumps out the most, is the allocation issue.  The

2   fee, the reasonableness needs to be on each stage at each

3   agreement.  The first agreement wasn't reasonable.  $134 for

4   all that work?  Of course, it was.  The next stage, the post-

5   petition work, which was very minimal, for 2,004, it's

6   unreasonable.

7           THE COURT:  Okay, thank you.  Now let me change the

8   subject slightly.  I'm thinking now more in terms of overall

9   administration of the system.  To what extent do you believe

10  that there are any procedures in place that identify for the

11  U.S. trustee the existence of a bifurcated agreement, and if

12  that is occurring, does the U.S. trustee have an active

13  program in reviewing these?

14          MR. SCHANNE:  It's an issue that is on our radar as

15  evidenced by the memo that was just issued.  I do not believe

16  a formalized process has yet been put in place from D.C., but

17  it's something that has the program's attention.

18          THE COURT:  Okay.  All right --

19          MR. SCHANNE:  And again --

20          THE COURT:  -- go ahead.  Go ahead.

21          MR. SCHANNE:  I'm sorry, and it's -- again, it's not

22  because DOC's position is that they're prohibited, it's just

23  to make sure that they're reasonable and the other issues are

24  touched upon.

25          THE COURT:  Yes.  Would I be interpreting the U.S.

1   trustee's policy on this to be that given the considerations

2   that have to be evaluated, and to the extent it's relatively

3   fact intensive, that there needs to be a process by which

4   every bifurcated fee agreement is reviewed by someone, whether

5   it's the U.S. trustee or the board or both?

6           MR. SCHANNE:  Your Honor, especially in these cases

7   where it's no, or low, a few hundred dollar money down type

8   cases, it does need to be reviewed for whether that is a

9   reasonable allocation of the fees.  And then whether their

10  appropriate disclosures are being made, because as we saw

11  here, it was difficult to figure out until we came to this

12  hearing.

13          THE COURT:  Okay.  All right, thank you.  All right,

14  in light of Mr. Schanne's comments, is there anything you wish

15  to add, either Mr. Assad or Mr. Cibik or both of you?

16          MR. ASSAD:  I certainly have taken notes and I'm

17  taking what Mr. Schanne has said under advisement and intend

18  to revise our agreements and practices accordingly going

19  forward.

20          THE COURT:  Okay.

21          MR. CIBIK:  I have a question for Mr. Schanne.

22  Might it be the trustee's intentions to put some guidelines

23  together going forward, or even to provide us with a sample

24  bifurcated pre and post agreement that one can use?  Otherwise

25  you'll have different attorneys, if they're going to partake

1   in a bifurcation issue, they'll each have different type of

2   retainer agreements pre and post, and that's just going to be

3   chaos.  So I would prefer if the court or the trustee's office

4   1) give us a little bit more guidance of how we can handle

5   this in our eastern district, and then furthermore if they

6   could consider supplying maybe a standard template by pre- and

7   post-petitions agreements, which are the things that you would

8   like -- they would like to see us as attorneys to utilize with

9   our agreement with the client.

10          MR. SCHANNE:  For the record, John Schanne.  I don't

11   believe -- I don't want to duck the question, but I don't

12   believe I have authority to comment on the policy.  I think I

13   need to bring this to the AUST and maybe the UST himself.  But

14   I understand the question and I will certainly relay the

15   concern.

16          MR. CIBIK:  Yeah, okay.

17          THE COURT:  All right, is there anything anyone

18   wants to add at this point?

19          MR. CIBIK:  I don't have anything.

20          THE COURT:  Okay.  I hope I am able at this point to

21   express all the various thoughts I have about this.  I've been

22   following the bifurcated fee issue from afar since it really

23   had not arisen in a fashion that required me to hold a hearing

24   on one before today, and, you know, I have some general views

25   about it which leave me very conflicted.  You know, on the one

1    hand I certainly appreciate the forces in play that are

2    leading practitioners and courts to try to find a way to

3    permit this process to take place.  It's an access to the

4    court's process, and -- access to the court's issue.  And I

5    think the U.S. trustee's policy statement expresses it well,

6    which is that from a policy perspective, if there is a way to

7    allow this procedure to go forward, yet protect the legitimate

8    interests of the system and debtors, it may well be worth it

9    to allow debtors without resources to get access to the

10   bankruptcy court.  I certainly get that.  But what I sense is

11   really going on here, and I don't mean this in the pejorative

12   way that it sounds, but what's going on is that practitioners

13   and judges are finding a way to nullify what the code says.

14   Now that happens all the time.  It happens in chapter 11, it

15   happens when doctrines are created, like the doctrine of

16   necessity, and I think that is what is going on here, is that

17   there is a perception among practitioners and the courts and

18   the U.S. trustee that as a means of -- as a necessity, courts

19   need to find a way to permit bifurcated agreements to go -- to

20   be -- to exist so that people who have an immediate need can

21   file.  In my mind that raises issues about the proper role of

22   the court versus the legislature.  But in bankruptcy there is

23   a tradition of the courts being quite active in shaping the

24   construction of the code based on equitable considerations.

25   And that may -- and I'm not saying it's wrong for the courts

1   to be doing it here.  I guess the metaphor I would use is that

2   I think it's on thin ice.  Now that said, I even think that

3   the considerations the U.S. trustee has laid out in the policy

4   statements, which I think are very well thought out and really

5   hit the nail on the head, still leave us with some structural

6   problems, and the big one is the one that came up in the case

7   today.  It's the allocation issue.  It is -- I say this based

8   on both an abstract view of what needs to be done to handle a

9   case, and my own experience before I was on the bench.  In a

10  chapter 7 case, much or most of the work is done before the

11  filing.  I've just recently had cases where, when in chapter 7

12  the proper amount of preparation and investigation wasn't

13  done, it becomes catastrophic for the debtor.  Any regular

14  chapter 7 practitioner has to know that they have to be very

15  careful about things, about the means test, about exemptions,

16  about fraudulent transfers.  It's a structural problem, even

17  with the guidelines.  Another problem I see that I consider to

18  be a structural problem relates to the requirement that there

19  be full disclosure.  Obviously it makes sense; there should be

20  full disclosure.  But even that becomes problematic.  By the

21  time you make full disclosure, you have a six-page single-

22  spaced document.  How realistic is it to expect an individual

23  who is in distress, who is in a lawyer's office saying there's

24  an emergency, to be able to critically review and digest this

25  information.  These are all reasons why one might say none of

1   this should exist.  Yet the flip side of it is that there are

2   some very good reasons to permit bifurcated fees.  There are

3   cases where -- and I don't think this case is one of them, it

4   seems to me, where the right result is to give a person access

5   to the courts and allow them to pay some of the fees post-

6   petition.  As a concept, there's nothing inherently wrong with

7   that other than it just doesn't fit into the code right now.

8   I'm not the first person to say that congress could have fixed

9   this -- could fix this with a legislative solution.  Instead

10  we have courts, practitioners and U.S. trustee -- and again, I

11  don't mean this as pejoratively as it sounds -- going through

12  legal gymnastics to try to find a way to allow this to occur.

13      The other factor in all of this is that it does require -

14  - well, let me back up a step.  In respect to both the

15  allocation between pre- and post-petition services and the

16  informed consent concept, what courts are being asked to do is

17  to accept a fiction in order to find a way to let these

18  agreements go through.  And maybe the courts should accept the

19  fiction.  Courts accept lots of fictions.  We accept fictions

20  in chapter 11 that unsecured creditors read disclosure

21  statements word for word.  I'm not sure why consumer cases

22  should be any different than -- in permitting fictions to

23  determine the outcome.

24      And then the last issue is should these kinds of cases be

25  limited to when they're necessary, when it's some kind of an

Case 22-11355-elf   Doc 26   Filed 08/24/22   Entered 08/24/22 08:53:04   Desc Main
Document     Page 45 of 50

45

1    emergency.  And again, this case, I'm satisfied fits that

2    category.  But what it points out is that there may be a need

3    for every one of these cases to be reviewed, whether it's by

4    the U.S. trustee or the court or both.  So those are my, I

5    guess, thoughts about this from 3,000 feet.

6        Now turning to this case, I agree with Mr. Schanne, there

7    are some flaws in the agreements that can be fixed, but I

8    think that in this particular case, it was substantial

9    compliance.  I mean, this was a good faith effort to comply

10   with the U.S. trustee guidelines.  I am fully satisfied about

11   that.  So for me, the two issues that I'm left with are the

12   premium that was put in the case for the bifurcated fee, which

13   I would not allow.  I mean, I agree with the U.S. trustee that

14   that's inappropriate.  But that's a simple fix; you can just

15   take that -- the premium out.  The more difficult issue is the

16   allocation.  And so what I'm going to do is I'm not going to -

17   - I'm going to need to think about it a little bit more about

18   exactly how I want to handle the allocation issue.  What I'm

19   going to do is make some adjustment to the fee and I'm going

20   to issue an order that allows a certain -- finds a certain fee

21   to be reasonable by subtracting the amount we know was paid

22   pre-petition.  Everyone will know how much is still payable

23   post-petition.  And to that extent I will validate the fee and

24   say that the agreement is valid in this particular case.  So I

25   guess the upshot is I'm going to allow this, I'm going to

1   adjust it a bit for the reasons that I've expressed, but as a

2   matter of equity, I do feel here that the debtor received

3   services that have a value and in the circumstances here, with

4   all my misgivings about the state of the law, I'll join those

5   courts that allow this.  So I don't have a final number for

6   you or final decision for you, but I've given you the

7   parameters of where I'm headed and I'll be able to issue an

8   order that quantifies this very shortly.  So I'll stop there.

9   Is there anything that I've left out or does anybody have any

10  questions about my ruling at this point?

11          MR. ASSAD:  I just would ask for the record -- this

12  is Michael Assad -- not to rush you, but how long do you think

13  that it will take you to issue an opinion or an order, I just

14  want to --

15          THE COURT:  Well, I'm not writing an opinion.

16          MR. ASSAD:  Okay.  I just --

17          THE COURT:  I'm just going to issue an order.

18          MR. ASSAD:  Okay.

19          THE COURT:  It's way too soon in my mind for me to

20  start writing opinions on this; this is a tough subject for

21  me.  So you'll have it within a couple of days --

22          MR. ASSAD:  Okay, I just want to look out for it.

23          THE COURT:  -- at the outset.  Yes, you'll -- very

24  soon, might be this week even.

25          MR. CIBIK:  I have one comment.  I would welcome

1    with great blessing a structured guidance that would help us

2    all, and God bless you if you come up with something like

3    that.

4              THE COURT:  Yes, I think the problem is you're

5    probably not going to get more guidance than you got.

6              MR. CIBIK:  Okay.

7              THE COURT:  Right from the U.S. Trustee.  It was a

8    very detailed set of considerations.  And I don't think you're

9    going to get guidance in the sense that any court is going to

10   come up with a formula that says you can have a 40/60 split in

11   allocation.  I just don't think anyone is going to do that.  I

12   mean, I'm thinking out loud here to some extent, but that's my

13   visceral reaction to it.  And it is a tough issue because of

14   how certain you have to be that a chapter 7 is right before

15   you file because you can't get out easily.  It's not chapter

16   13.  You can't just dismiss a chapter 7 case.

17             MR. CIBIK:  Yeah, you'll (indiscern.).

18             THE COURT:  So I mean, you know that.  You've been

19   doing it longer than I've been doing it, Mr. Cibik.

20             MR. CIBIK:  Not (indiscern.).  Yeah, you're probably

21   right.  We've been (indiscern.) together, about 1980, yeah,

22   when we -- when (indiscern.) changed.

23             THE COURT:  So --

24             MR. CIBIK:  But this was an interesting -- I now

25   have better thoughts in my head on what you're looking for and

1   which we want to comply with, and we'll make some changes in

2   our agreement, and obviously the balance pre and post.

3          THE COURT:  Okay.  Now --

4          MR. CIBIK:  I have a clear picture.  From this

5   hearing I have a clear picture going forward and that's good

6   for me personally and I think, you know, it will be good for

7   the court.

8          THE COURT:  Okay.  I hope it was helpful.  Ms.

9   Gartei, do you have any questions?

10         MS. GARTEI:  Yes, Your Honor.  My question was, and

11  it's just brief, the adjustments that you're considering, will

12  it be higher?

13         THE COURT:  No, no, it's not going to be higher,

14  it's going to be lower.

15         MS. GARTEI:  Okay.  I just wanted to make sense of

16  it, 'cause I had other questions and things like that, but

17  just you bringing clarity to that, we could just throw out

18  those other questions.

19         THE COURT:  Yes, yes.

20         MS. GARTEI:  I appreciate that.

21         THE COURT:  Yes, it will be a somewhat lower fee.

22  And I want to emphasize that I'm not being critical of your

23  lawyers.  I think they are working in an area that is

24  uncertain right now about how all of this is supposed to work.

25  Judges are not sure, judges are disagreeing.  They made an

1   effort to try to do it the right way, and it may have fallen

2   short in a couple of ways, but it was a really -- it really

3   was a good faith effort, so I'm not criticizing them.

4              MS. GARTEI:  Yes, I agree with you.  And they did

5   act in good faith and if I could impose, if someone was

6   looking to file bankruptcy, you know, if they had all the

7   money to pay up front, then in my case I -- there would be no

8   need for me to seek bankruptcy help, correct, because if I

9   have all that money to pay up front, then there should be --

10  then that means I should have a means or way to be able to

11  generate all the other incomes that I need to pay off all my

12  other creditors and things like that.  So I do agree with you

13  that they acted in good faith and yeah, it's -- you guys know

14  what else needs to be done further, and I'm just appreciative

15  of their good faith efforts.

16             THE COURT:  Okay, well, and I want to thank you for

17  taking your time to come to the hearing.  It was helpful for

18  me to have you here.  So I'll be issuing an order soon, and

19  once you have it, you'll probably need to discuss with Mr.

20  Cibik or Mr. Assad whatever adjustments you're going to make

21  in your arrangement to complete the payment of the fees.

22             MS. GARTEI:  Okay.

23             THE COURT:  All right?

24             MS. GARTEI:  Yes.

25             THE COURT:  Okay.

50

1          MS. GARTEI:  Thank you.

2          THE COURT:  All right, so with that I will conclude

3     the hearing.  I thank everyone.  I'll get an order out shortly

4     on this.

5          MR. ASSAD:  Thank you.

6          MR. SCHANNE:  Your Honor, my office thanks you for

7     the opportunity to attend and kind of give you our thoughts in

8     real time.  So to feed it to you cold, we thank you for your

9     patience.

10         THE COURT:  Oh, no, I'm happy to have you hear.

11    It's very helpful to me.

12         MR. CIBIK:  Thank you, John, for your insight also.

13    I appreciate that.

14         MR. ASSAD:  Thank you, Your Honor, thank you, Mr.

15    Schanne.

16         THE COURT:  Everyone have a good day.

17         MS. GARTEI:  Have a great day.

18         THE COURT:  Court is adjourned.

19         MS. GARTEI:  Thank you.

20       (Court adjourned)

21                    CERTIFICATION
22    I, Lewis Parham, certify that the foregoing is a correct
23    transcript from the electronic sound recording of the
24    proceedings in the above-entitled matter.
25
26
27    _Lewis Parham_                          8/23/22
28
29    _____        _____
30    Signature of Transcriber              Date